**ADAMS, ROWE & NORMAN, Inc., et al. v. BOWLES.**

**No. 110.**

United States Emergency Court of Appeals.
Heard at Birmingham, March 22, 1944.
Decided July 31, 1944.

James L. Davidson, of Birmingham, Ala., for complainants.

Warren L. Sharfman, Chief, Court Review Rent Branch, of Washington, D. C. (Richard H. Field, Acting General Counsel, Nathaniel L. Nathanson, Associate General Counsel, and Maurice Alexandre, Attorney, and Miss Mavis M. Clark, Attorney, all of Office of Price Administration, all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and LAWS, Judges.

MAGRUDER, Judge.

We have to decide in this case whether the Price Administrator is authorized, under the provisions of the Emergency Price Control Act, 56 Stat. 23, 50 U.S.C.A.Appendix § 901 et seq., to regulate the rents charged for company housing units rented to employees; and if so, whether the rent regulations in question, on the particular facts disclosed, are invalid insofar as they determine the maximum rents for complainants' company houses by reference to the same maximum rent date that is used to fix the maximum rents for housing accommodations generally in the two defense-rental areas involved. Both of these questions we answer in the affirmative.

The group of complainants in the case at bar are coal mine operators who describe themselves as "the operators of 98% of the rail-connected mine. capacity in the Defense-Rental Area of Birmingham (Jeffer-

son County) and Shelby County and St. Clair County in the Talladega Defense-Rental Area, which said operators own approximately 15,000 housing units in said areas," located near their mines, and rented exclusively to mine workers and their families. Their rentals for such company houses are subject to Maximum Rent Regulation No. 3, establishing maximum rents for accommodations in the Birmingham Defense-Rental Area (embracing Jefferson County, Alabama), and Maximum Rent Regulation No. 26, establishing maximum rents for housing accommodations in the Talladega Defense-Rental Area (embracing St. Clair, Shelby and Talladega Counties, Alabama). Rent Regulation No. 3 was issued May 27, 1942, effective June 1, 1942. 7 F.R. 4045. Rent Regulation No. 26 was issued June 30, 1942, effective July 1, 1942. 7 F.R. 4905. These, and similar regulations for other areas, were subsequently combined and designated Rent Regulation for Housing. 8 F.R. 7322.

For housing accommodations which were rented on April 1, 1941, Rent Regulations No. 3 and No. 26 both prescribe the rentals prevailing on that date as the maximum rent, subject to provisions for adjustment in certain exceptional types of cases. Complainants duly filed with the Price Administrator their consolidated protests against the regulations as applied to their company housing units. By order issued November 12, 1943, the Administrator denied the protests.

■ As originally issued § 5(a) (4) of each regulation provided that any landlord might file a petition for adjustment to increase the maximum rent otherwise allowable, upon the ground that the rent on the date determining the maximum rent "was materially affected by the blood, personal or other special relationship between the landlord and the tenant and as a result was substantially lower than the rent generally prevailing in the Defense-Rental Area for comparable housing accommodations on [the maximum rent date]." By Supplementary Amendment No. 12, adopted December 23, 1942, a previous interpretation of this adjustment provision by the Administrator was explicitly written into the regulations by the addition of the following: "Provided, That no adjustment under this subparagraph increasing the maximum rent shall be made effective with respect to any accommodations regularly rented to employees of the landlord while the accom-

modations are rented to an employee, and no petition for such adjustment will be entertained until the accommodations have been or are about to be rented to one other than an employee." This is the only specific reference in the regulations to company housing units. The validity of such proviso was upheld by us in Bibb Mfg. Co. v. Bowles, Em.App.1944, 140 F.2d 459. We held that there was a rational basis for the difference in treatment of owners of company houses rented to employees and of other landlords who had made rent concessions on the basis of some special relationship between themselves and their tenants. Insofar as the case of the present complainants is based upon a similar claim of discriminatory treatment, in answer we merely refer to our opinion in the Bibb case, to which we fully adhere.

■ Complainants also make a claim, asserted for the first time in their brief filed in this court, that the regulations arbitrarily discriminate against them by imposing rent control upon their company houses located in the counties of Jefferson, Shelby and St. Clair, although rent control is not extended to other contiguous counties "wherein mine villages are located and thousands of dwellings are leased to the employees of the owners thereof, who operate mines whose products come in competition with that of Complainants." Since this objection was not raised in the protest filed with the Administrator, it cannot be considered by this court. § 204(a) of the Act.

■ It is further objected by complainants that the Administrator has no authority under the Emergency Price Control Act to regulate the rents of company housing rented to employees. This objection, which we found unnecessary to consider in the Bibb case, is without merit. Section 2(b) of the Act authorizes the Administrator to establish defense-rental areas, which are defined in § 302(d) as meaning "any area designated by the Administrator as an area where defense activities have resulted or threaten to result in an increase in the rents for housing accommodations inconsistent with the purposes of this Act." Once the area is defined, all housing accommodations available for rental within such area are subject to the Administrator's control for the purpose of establishing rent ceilings. The Administrator's authority in this respect is not restricted by the fact, if it be a fact, that certain classes of housing accommodations within the area are less

likely to be seriously affected by inflationary pressures attributable to the expansion of defense and war activities. It may well be true that in holding the line against inflation the need for regulating rentals of company housing units has not been so acute or pressing as the need for establishing maximum rents for the general run of housing accommodations within the defense-rental areas. This might have justified the Administrator in exempting such special class of housing accommodations from rent control, for under § 2(c) he has a broad discretionary power to make "reasonable exceptions." But complainants have not established in the present record, and we do not believe it to be so, that the rentals charged for company houses are, or are sure to remain, wholly unaffected by the inflationary pressures exerted upon other segments of the economy as a result of greatly expanded defense and war activities. Cf. Philadelphia Coke Co. v. Bowles, Em.App.1943, 139 F.2d 349, 353. We cannot say that the Administrator acted arbitrarily in refusing to make an exception exempting altogether from rent control company houses rented to employees.

■ There remains to be considered complainants' objection to the date selected by the Administrator as the rent freezing date. We assume that April 1, 1941, was generally an appropriate maximum rent date for housing accommodations in the two areas. Complainants do not challenge this, but say that their company housing presented a special situation which called for separate treatment and that it was arbitrary and oppressive to freeze their rents as of April 1, 1941.

Much material has been included in the record on the economics of company housing. In Bibb Mfg. Co. v. Bowles, supra, we referred to the business reasons which have led to the establishment of this type of housing and the economic benefits in the form of production gains which employers hope to deprive therefrom. Employers generally do not expect to realize a profit from such housing, viewed strictly as real estate investments. Indeed, on this basis alone, complainants' figures show consistent losses over a period of years. It is undisputed that the rentals charged for complainants' company housing units have been much lower than the rentals prevailing for comparable non-company-owned housing accommodations. In addition to that, employee-tenants are furnished water free of cost, and electricity at a cost less than that paid by others to public utilities. Rentals for company housing have in the past been relatively stable and have not been very sensitive to fluctuations in the general rental market.

It appears that on April 1, 1941, complainants' employees were out on strike, in conjunction with a general coal strike. This strike was settled on May 10, 1941, by a two year agreement between the operators and the United Mine Workers of America under which wage increases averaging $30 per man per month were granted to complainants' employees retroactive to April 1, 1941. The master agreement did not deal directly with rentals for company houses, but remitted that subject to further negotiation locally. It was provided in the agreement between Alabama Commercial Coal Mine Operators and District 20, United Mine Workers, as follows: "House rents.— It is recognized that there is no requirement for employees to live in houses owned by the Company. Any question regarding adjustment of rent with any company for such houses shall be taken up for adjustment locally and subject to the provisions for Settlement of Disputes."

Subsequently, each of the complainant operators negotiated an adjustment of rents with its employees through the established machinery of collective bargaining. In consideration of the raises in wages that had already been agreed upon and of the undertaking by the operators to spend considerable sums in repairs and betterments, the employees consented to small increases in rents, averaging around 25¢ or 30¢ per room per month, and bringing the total rent, on the average, to $2 per room per month. These increased rentals for complainants' houses went into effect October 1, 1941. Meanwhile complainants made the extensive repairs as agreed.

Such was the situation when the two rent regulations now in question went into effect, Rent Regulation No. 3 on June 1, 1942, and Rent Regulation No. 26 on July 1, 1942. As we have seen, these regulations rolled back the rentals to April 1, 1941, thereby depriving complainants of the increases which had gone into effect in October, 1941, the only increases, incidentally, which had been made for several years in complainants' housing units.

We think that the application of the April 1, 1941, maximum rent date to this large special class of housing accommodations produced a manifestly inequitable result. The economic factors affecting the

rental levels of company houses differ in many respects from the factors which are operative in the general rental market. The special situation presented by this atypical but numerous group of housing accommodations called, we think, for separate treatment. It is obvious that the rents charged to employees bear a close relationship to the wages paid such employees. If the employee receives a wage increase of $30 per month and at the same time the rent for the company house which he occupies is raised $2 per month, his net gain derived from the collective bargaining negotiations with his employer is $28 per month. This obvious fact is recognized in a joint report by appraisers selected by the Alabama By-Products Corporation, one of the complainants herein, and its employees, to make an appraisal of the rental value of this company's houses. The report, dated June 7, 1941, stated: "It is evident that your Company * * * has constructed and is furnishing houses at the low rent charged more as in incentive and inducement (you might say in the nature of additional pay) to the men to come and work at your mines, and remain there rather than with the idea of large, or even satisfactory return upon the capital invested therein, and not based upon the law of supply and demand, and should such facilities be furnished by outside capital the charges would be very much higher."

The negotiations for wage increases and the negotiations for adjustment of rents constituted part of a continuous process of collective bargaining upon interrelated matters. Complainants are bound by the agreed upon wage increases and it is inequitable to deprive them of the partially offsetting rent increases which were the ultimate outcome of the collective bargaining process and which were put into effect on October 1, 1941.

We pointed out in Hillcrest Terrace Corp. v. Brown, Em.App.1943, 137 F.2d 663, that while Congress undoubtedly sanctioned the use by the Administrator of the maximum rent date method of rent stabili-

zation as a generally applicable formula for determining maximum rents, it recognized that some provision for adjustments and exceptions would be essential in formulating workable maximum rent regulations. See Sen. Rep. No. 931 (77th Cong., 2d Sess.) p. 17. Accordingly, it provided in § 2(c) of the Act that the regulations "may contain such classifications and differentiations, and may provide for such adjustments and reasonable exceptions, as in the judgment of the Administrator are necessary or proper in order to effectuate the purposes of this Act." [1]

Acting under the authority of § 2(c) the Administrator has accorded special treatment to housing accommodations constructed and owned by the federal and state governments and agencies thereof, recognizing the special economic factors which differentiate such housing from the general run of housing accommodations. See Northwood Apts., Inc., v. Brown, Em.App.1943, 137 F.2d 809, 815. Though the factors are different, the reasons are quite as strong for giving separate treatment to the large special class of company-owned houses rented to employees. When the situation of complainants' houses was brought to the attention of the Administrator by the protests, showing the inequity resulting from the application to this particular class of accommodations of the generally applicable maximum rent date, we think the Administrator must be deemed to have acted arbitrarily in refusing to grant relief that he was fully empowered to afford under § 2(c). Separate treatment of this class of accommodations would not, so far as we can see, involve any insuperable or even unduly burdensome administrative difficulties. We are confident that Congress intended, not only that the regulations should be "generally fair and equitable," but that it should be the duty of the Administrator under § 2(c) to avoid or eliminate manifest inequities in exceptional classes of cases so far as this might reasonably be done consistently with the main objective of the Act and with the effective administration of the stabilization

---

[1] The Stabilization Extension Act of 1944, P.L. 383 (78th Cong., 2d Sess.), 50 U.S.C.A.Appendix, § 902(c), has amended § 2(c) by adding the following mandatory provision: "Under regulations to be prescribed by the Administrator, he shall provide for the making of individual adjustments in those classes of cases where the rent on the maximum rent date for any housing accommodations is, due to peculiar circumstances, substantially higher or lower than the rents generally prevailing in the defense-rental area for comparable housing accommodations, and in those classes of cases where substantial hardship has resulted since the maximum rent date from a substantial and unavoidable increase in property taxes or operating costs."

program. See Hillcrest Terrace Corp. v. Brown, supra.

A judgment will be entered setting aside the provisions of Maximum Rent Regulations No. 3 and No. 26 insofar as they apply the maximum rent date April 1, 1941, to the housing accommodations owned by complainants and others similarly situated and rented to their respective employees.

Judge LAWS concurs in the result.