**UTAH JUNK CO. v. FLEMING, Temporary Controls Administrator.**

**No. 184.**

United States Emergency Court of Appeals.

Heard at Washington July 10, 1946.

Decided Dec. 19, 1946.

Rehearing Denied January 15, 1947.
Writ of Certiorari Denied March 31, 1947.
See 67 S.Ct. 1084.

McALLISTER, Judge, dissenting.

————◆————

Keith L. Seegmiller, of Washington, D. C. (Ernest L. Wilkinson, of Washington, D. C., on the brief), for complainant.

Jacob D. Hyman, Associate Gen. Counsel (Richard H. Field, Gen. Counsel, William R. Ming, Jr., Chief, Court Review Price Branch, and Carl H. Fulda, Irving J. Helman, and John J. Downey, Jr., Attys., all of the Office of Price Administration, all of Washington, D. C., on the brief), for respondent.

Before MAGRUDER, McALLISTER, and LAWS, Judges.

MAGRUDER, Judge.

When this case was here before (Utah Junk Co. v. Bowles, Em.App., 150 F.2d 963) we dismissed the complaint, not on the merits, but on a point of procedure as to which it turned out we were mistaken. Since at the time the protest was filed the Price Administrator had already amended the regulation prospectively in a manner acceptable to complainant, we thought that the protest was untimely. Our idea was that the primary purpose of the protest procedure was to afford the Price Administrator an opportunity to consider the desirability of prospective changes in regulations in the light of objections set forth in protests by persons subject thereto. This is a matter within his special administrative competence; which, we thought, could hardly be said of a declaratory opinion by the Price Administrator on the question of law as to the past validity of a superseded provision of a regulation. If an adjudication of past validity becomes important, as in a criminal or civil enforcement suit (neither of which is pending here), § 204(e) of the Emergency Price Control Act, as amended in 1944, 58 Stat. 639, 50 U.S.C.A. Appendix, § 924(e), furnishes a remedy to the alleged violator; he may, pursuant to leave of the enforcement court, file a complaint directly in this court challenging the validity of the superseded regulation upon which the enforcement proceeding was predicated. Our judgment dismissing the complaint was taken up on certiorari. The Supreme Court reached the conclusion that there was no warrant for reading any qualification into the broad language of §. 203(a), as amended, 50 U.S.C.A. Appendix,.

§ 923(a), to the effect that a protest might be filed "at any time" after the issuance of a regulation. Therefore, that court held that an adjudication of past validity of a superseded regulation might be obtained via the protest route, as well as by a complaint filed directly in this court under § 204(e). 328 U.S. 39, 66 S.Ct. 889. The case is now back to us on remand for consideration of the merits.

Complainant is engaged in the business of purchasing, preparing and selling scrap metal in Salt Lake City, Utah. There is a concentration of non-ferrous smelters in the States of Utah and Montana. Lead ores are treated in blast furnaces which require as a fluxing agent scrap iron, known as smelter fluxing scrap, in sizes not greater than 12 x 24 in. and preferably 12 x 22 in. This is smaller than the scrap suitable for use in the steel industry. In the more populous and heavily industrialized areas of the country where steel plants are located and where the greatest need for scrap exists, scrap is available in great quantities and in innumerable sizes and shapes so that small pieces of scrap metal can be made available merely by sorting. The area in which complainant operates is sparsely settled, and available supplies of scrap metal are correspondingly small. It has been impossible for complainant to supply from available stocks sufficient scrap to meet lead blast furnace requirements without cutting the scrap by the use of electric shears and torches to the specifications required by lead smelters. Complainant has the facilities and trained personnel necessary for this operation. For many years complainant has furnished to the United States Smelting, Refining & Mining Company an important part of its fluxing scrap requirements for its large lead smelter at Midvale, near Salt Lake City.

Maximum prices for iron and steel scrap were first established by Price Schedule No. 4—Iron and Steel Scrap, issued April 2, 1941, under executive authority (6 F. R. 1767). After the enactment of the Emergency Price Control Act of 1942, that schedule was reissued as Revised Price Schedule No. 4 and republished in the Federal Register on February 21, 1942 (7 F. R. 1207). After frequent amendments RPS 4 was, on June 30, 1944, revised and reissued as Maximum Price Regulation 4 (9 F. R. 7330).

Section 13 of RPS 4 contained definitions of 23 grade specifications of scrap and established maximum prices for the listed grades. There was no separate category for fluxing scrap as such; but it does not follow from this, as complainant insists, that RPS 4 as originally issued left fluxing scrap entirely free of price control. RPS 4 was quite clearly intended as a comprehensive regulation governing all phases and aspects of the iron and steel scrap industry. Section 1 provided that, regardless of the terms of any contract, "no person shall sell, offer to sell, deliver, or transfer iron and steel scrap * * * at prices higher than the prices set forth" in subsequent sections of the schedule. Section 11(b) defined "iron and steel scrap" as meaning "all kinds and grades of imported and domestic iron and steel scrap including iron and steel railroad scrap." Fluxing scrap is certainly a kind of "iron and steel scrap". Though specifications for fluxing scrap were not separately listed in RPS 4, fluxing scrap fell within the more inclusive specifications of No. 2 heavy melting steel.[1] In other words, fluxing scrap might be regarded as a more selective No. 2 heavy melting steel, particularly in regard to the detail that fluxing scrap had to be in smaller-sized pieces than allowed under the

---

[1] The detailed specifications were amended from time to time. Following are the specifications for this grade as set forth in MPR 4 (9 F.R. 7336):

"No. 2 heavy melting steel. Wrought iron or steel scrap, black or galvanized, 1/8 inch and over in thickness, not over 18 inches in width and not over 5 feet in length. (Uncut bumpers and front axles of passenger automobiles free of wheels and brake assemblies and drained of oil, may be included even though over 5 feet in length.) Individual pieces must be free from attachments and so cut as to lie flat in the charging box. May include pipe; heavy oil field or similar cable not less than 1 inch in diameter and cut to lengths of 3 feet or less; and car sides and light plate cut 15 inches by 15 inches or under. May not include auto body and fender stock."

specifications for No. 2 heavy melting steel. Notwithstanding this, § 13(a), footnote 6, contained the following provision: "Except upon prior approval by the Office of Price Administration, no grade of scrap deemed by the buyer or seller or both to be superior to any grade listed above shall be purchased at a premium above the corresponding listed grade * * *." Footnote 6 also provided: "In no case may special preparation charges be added to the prices listed above." This provision was shortly thereafter amended by Amendment No. 2 to RPS 4, issued March 30, 1942 (7 F. R. 2507), so as to read: "Except upon prior approval by the Office of Price Administration, no special preparation charges may be added to the prices listed above."[2]

From the foregoing it is apparent that complainant was forbidden to sell fluxing scrap at a premium over the prices established by RPS 4 for heavy melting steel, or to make a preparation charge for the operation of cutting the scrap metal to the required sizes for fluxing scrap, without first applying for and obtaining the approval of the Office of Price Administration.

On April 25, 1942, a representative of the Office of Price Administration visited complainant's offices and inspected its books and records. He informed complainant that it could not lawfully charge for fluxing scrap more than the maximum prices established for No. 2 heavy melting steel. Notwithstanding this, in the period April 25, 1942, to February 10, 1943, complainant made shipments of fluxing scrap to U. S. Smelting, Refining & Mining Company, billed at prices in excess of such ceiling, though complainant did not collect or attempt to collect any overcharge above the ceiling.

In May, 1942, complainant began negotiations with the Salt Lake City office of the OPA seeking to be allowed to add a special preparation charge for cutting scrap metal down to the sizes required for fluxing scrap. It is stated in the Price Administrator's opinion—and not controverted by complainant—that in 1942 and 1943 "the officials of the Salt Lake City office advised the Prot-

estant repeatedly that they had no authority whatsoever to grant requests for price increases and that relief could be granted only by the Price Administrator in Washington; they even suggested that Protestant communicate with other scrap dealers in the Salt Lake City area and file a joint petition for relief." Complainant did try "to get all scrap dealers in Salt Lake City and vicinity to agree upon specifications and regulations which would suit the sale of scrap for smelting purposes"; but extended efforts produced no agreement along this line.

In November, 1942, U. S. Smelting, Refining & Mining Company filed with the Price Administrator in Washington a formal petition for amendment of RPS 4, requesting permission to pay complainant and others an extra fee for fluxing scrap. Attached to the petition was an affidavit from complainant's president stating that such preparation charge was necessary to cover the cost of cutting up scrap for smelting use in lead blast furnaces. This petition for amendment was denied by the Price Administrator in January, 1943, on the ground that the specifications for "foundry steel, 2 feet and under" and "foundry steel, 1 foot and under" established by Amendment No. 10 to RPS 4, issued January 16, 1943 (8 F. R. 858), were substantially in accordance with the requirements outlined in the petition.

The new grades of foundry steel proved not to be a full answer to complainant's special problem. The Industry Advisory Committee at a meeting held in September, 1943, considered the question whether the premiums provided by Amendment No. 10 for foundry steel should also be allowed for fluxing scrap of the same sizes, including, however, certain materials, such as pipe and cable, not permitted in the foundry steel specifications but suitable for use in lead blast furnaces. It was the opinion of the committee that this was a relatively minor problem and that it should be handled on an individual basis. Accordingly, on December 21, 1943, the Iron and Steel Price Branch of the Office of Price Administration authorized the Regional Office in Den-

---

[2] By Amendment No. 6 (7 F.R. 4490), this adjustment provision became § 13 (a) (5) of the price schedule. See also 7 F.R. 8191; 8 F.R. 857.

ver, Colorado (whose jurisdiction includes the State of Utah), upon individual application under § 13(a) (5) of RPS 4, to permit a premium of $1.50 for preparation and cutting of No. 2 heavy melting steel scrap to smelter specifications.

Pursuant thereto, on January 28, 1944, complainant addressed a letter to the Salt Lake City office of the OPA asking for permission to charge a premium of $1.50 per gross ton for preparation of iron and steel scrap to be used as a flux in smelter operations. The application contained detailed specifications for fluxing scrap.[3] Under date of February 19, 1944, the local office sent a notification to complainant that its application had been granted without modification in any particular; and on April 5, 1944, the Washington office of the OPA confirmed this authorization, with the limitation that it should apply only on sales to non-ferrous smelters.

When RPS 4 was revised and reissued as MPR 4 on June 30, 1944, § 3(c) (2) thereof (9 F. R. 7331) contained the general provision permitting non-ferrous smelters to pay an extra charge of $1.50 per gross ton for preparing No. 2 heavy melting steel to a length of two feet or less, and a width of 15 inches or less.

It was not until August 7, 1944, several months after complainant had received satisfactory prospective relief, that complainant filed its protest against § 13 of RPS 4 applying the maximum prices established for heavy melting steel to sales of smelting fluxing scrap made by complainant to U. S. Smelting, Refining & Mining Company between April 25, 1942, and February 10, 1943. The relief sought was "authority to demand and collect from United States Smelting, Refining & Mining Company the sum of $4,572.49, representing $1.50 per ton preparation charge for 3,-

048.33 tons of scrap prepared to the specifications required for lead blast furnace fluxing scrap and shipped and sold to United States Smelting, Refining & Mining Company between the 25th day of April, 1942 and the 10th day of February, 1943." By order issued October 20, 1944, the Price Administrator denied the protest.

The present complaint was filed in this court on November 20, 1944. On January 16, 1945, we granted an application of complainant for leave to introduce additional evidence, which was ordered to be presented to the Price Administrator. Accordingly, the protest proceedings were reopened for the reception of the additional evidence. On April 4, 1945, the Price Administrator entered his order denying the protest upon reconsideration. A supplementary transcript of the protest proceedings was filed with this court.

The complaint contains the following allegation: "The United States Smelting, Refining and Mining Company is ready, able and willing to pay complainant an additional $1.50 per ton for the 3,048.33 tons of smelting fluxing scrap delivered to it between April 25, 1942 and February 10, 1943, except for respondent's denial of the complainant's protest, holding in effect that such payment would be illegal." It is complainant's position that RPS 4, properly construed, specified no maximum price for fluxing scrap during the period now in question; but that if the schedule is construed as having set for fluxing scrap the same maximum prices as were established for heavy melting steel, then the schedule was arbitrary and capricious, and invalid, as applied to complainant's sales of fluxing scrap during that period.[4]

For the reasons which we have already stated above, we think complainant's point as to the interpretation of the schedule is

---

[3] "Wrought iron and steel scrap, black or galvanized, 1/8 inch and over in thickness, not over 12 inches in width and not over 2 feet in length. Individual pieces shall not weigh over 50 pounds, must be free from attachments and so cut as to lie flat in the charging box: May include pipe cut to lengths of 2 feet or less; and may include heavy oil field or similar cable not less than 1 inch in diameter and cut to lengths of 2 feet or less. May not include auto body and fender stock, tin plate, terne plate, or other metal coated material."

[4] The Price Administrator has denied that the price fixed for heavy melting steel was below the cost of production of smelting fluxing scrap. In the view we take, it is unnecessary to discuss the evidence on this point, which is analyzed in the Price Administrator's opinion denying the protest upon reconsideration.

not well taken and that the prices established in RPS 4 for heavy melting steel applied to complainant's sales of fluxing scrap. The question remaining to be considered is whether § 13 of RPS 4 was invalid as applied to complainant's sales of fluxing scrap during the period April 25, 1942, to February 10, 1943. In effect, complainant asks us for a declaratory judgment that the price schedule was so invalid.

The basic requirement of the Act is that a regulation shall be "generally fair and equitable" in its industry-wide application. However, Congress recognized that a regulation conforming to this general standard might cause unnecessary hardship in special or atypical situations which perhaps were not even in the contemplation of the Price Administrator at the time he promulgated the regulation. Accordingly it was provided in § 2(c) of the Act, 50 U.S.C.A. Appendix, § 902(c), that regulations "may contain such classifications and differentiations, and may provide for such adjustments and reasonable exceptions, as in the judgment of the Administrator are necessary or proper in order to effectuate the purposes of this Act." In Adams, Rowe & Norman, Inc. v. Bowles, Em.App., 1944, 144 F.2d 357, 360, we said: "We are confident that Congress intended, not only that the regulations should be 'generally fair and equitable,' but that it should be the duty of the Administrator under § 2(c) to avoid or eliminate manifest inequities in exceptional classes of cases so far as this might reasonably be done consistently with the main objective of the Act and with the effective administration of the stabilization program."

■ That is not to say that a regulation is necessarily invalid ab initio for failure to make particular provision for any special or local situation which might properly have been taken care of by the Price Administrator pursuant to his authority under § 2(c). It cannot be said that the Price Administrator acts arbitrarily or capriciously in failing to grant an adjustment or other special relief under § 2(c) until the equities of the special situation are made known to him. In Hillcrest Terrace Corp. v. Brown, Em.App., 1943, 137 F.2d 663, and in Adams, Rowe & Norman, Inc.

v. Bowles, supra, special situations in which the general freeze date formula of the rent regulation worked peculiar hardship were presented to the Price Administrator in protests. In each case we were careful to say that, when the special situation was brought to the attention of the Price Administrator by the filing of the protest, the Price Administrator acted arbitrarily and capriciously in denying the relief he was fully empowered to grant under § 2(c) of the Act. Not until then did the regulation, which was generally fair and equitable, become invalid in its application to the particular complainants.

What we have just said applies with particular force to the case at bar. RPS 4 was a comprehensive regulation of the iron and steel scrap industry, which industry, as the Price Administrator observes in his opinion, is enormously complicated from the point of view of price control, so that any change in differentials or premiums needs to be carefully weighed lest it result in dislocation of supply. The Price Administrator could hardly have made special provision at the outset for every obscure ramification of such an industry. The most that could fairly have been expected of him was to put forth a regulation which was generally fair and equitable, implemented with an adjustment provision to take care of minor details, or of special or local situations. Such was the case here. As above stated, from and after March 30, 1942, RPS 4 contained the provision that no special preparation charges might be added to the listed prices "except upon prior approval by the Office of Price Administration." That was an invitation to complainant to put its special case before the Price Administrator in an application for permission to make a preparation charge for fluxing scrap. The problem was a local one, and from the standpoint of the Industry Advisory Committee it was a "minor" one. It resulted from the fact that, in the area wherein complainant operated, scrap metal was not available in large enough quantities so that the small sizes needed for fluxing scrap could be obtained merely by sorting. This is why it was a hardship to complainant to be held to the prices established for heavy melting steel without an

allowance to cover the extra preparation costs.

Complainant did not promptly pursue its indicated administrative remedy of applying for a special adjustment. The local office of the OPA at Salt Lake City informed complainant that an application for adjustment would have to be made to the Price Administrator in Washington—that authority to act on such applications had not been delegated to the regional offices.[5] Complainant spent a considerable time trying to persuade the local office "that heavy melting steel regulations were not applicable to lead smelter fluxing scrap"; in other words, that RPS 4 did not cover fluxing scrap at all. It also sought without success to work out with other scrap dealers in the locality an agreed specification for fluxing scrap. Such specification, of course, had to be worked out in an acceptable form before an additional premium for fluxing scrap could appropriately be allowed by the Price Administrator. When complainant finally did make its formal application for adjustment under § 13(a) (5) of the schedule, by letter to the local office dated January 28, 1944, setting forth a detailed specification for fluxing scrap, that office, then having delegated authority, promptly granted the same.

■■■ It is our opinion that until complainant obtained this individual adjustment, on February 19, 1944, permitting it to make a special preparation charge of $1.50 per gross ton for fluxing scrap, its ceilings were validly fixed by RPS 4 at the prices established for heavy melting steel.[6]

A judgment will be entered dismissing the complaint.

McALLISTER, Judge (dissenting).

It is the duty of the Price Administrator under Section 2(c) of the Emergency Price Control Act to avoid and eliminate manifest inequities in exceptional classes of cases so far as this may reasonably be done consistently with the main objective of the Act and with the effective administration of the stabilization program. Adams, Rowe & Norman, Inc. v. Bowles, Em.App., 1944, 144 F.2d 357.

After numerous delays resulting from "unfamiliarity with the technical requirements of emergency legislation," as remarked upon in Utah Junk Co. v. Porter, 328 U.S. 39, 66 S.Ct. 889, as well as various long drawn out communications and consultations with the Office of Price Administration, complainant finally filed a formal application, and secured an adjustment. Manifestly, this was granted pursuant to Section 2(c) of the Act, and resulted from the Price Administrator's fulfillment of his duty to avoid and eliminate under the proper circumstances a manifest inequity.

I am of the opinion that when the Price Administrator, in a regulation, neglects to avoid and eliminate manifest inequities in exceptional classes of cases so far as this may reasonably be done consistently with

---

[5] Under Procedural Regulation No. 1 such an application, in the specified form, could have been filed with the local office, whose duty it would have been to forward it to the authorized office in Washington; or complainant itself could have filed the application with the OPA in Washington.

[6] It has occurred to us that the so-called petition for amendment, which was filed by complainant's customer, U. S. Smelting, Refining & Mining Company, in November, 1942, accompanied by an affidavit executed by complainant's president, might have been regarded as in substance an application for adjustment by complainant. At any rate, if such petition and affidavit adequately set forth the special case of complainant, so as to bring the facts to the attention of the Price Administrator, indicating the need

of a special preparation charge for fluxing scrap and setting forth an acceptable specification for that commodity, it might have been arbitrary and capricious for the Price Administrator to deny relief at that time. However, the petition for amendment is not set forth in the record, and we do not know in detail what it contained. Apparently at this time the complainant had not yet succeeded in its efforts "to get all scrap dealers in agreement upon a specification to fit and cover Smelter fluxing scrap." This petition for amendment was denied some time in January, 1943—the exact date does not appear. We do not pursue the point because it would make very little difference in the present case. The period for which complainant is seeking a declaration of invalidity of the price schedule ended February 10, 1943.

the main objective of the Act and with the effective administration of the stabilization program, then the regulation is invalid ab initio as to any person entitled to adjustments, and should so be determined on a hearing in which relief by way of an adjustment is granted. Nothing that was decided, or said, in Hillcrest Terrace Corp. v. Brown, Em.App., 1943, 137 F.2d 663, or in Adams, Rowe & Norman, Inc. v. Bowles, supra, seems to me to tend to the contrary or to militate against the foregoing conclusion.

In this case, the Price Administrator has determined that complainant suffered from such inequities, and for that very reason, granted adjustments to avoid and eliminate them. But complainant suffered from them from the inception of the regulation. It is entitled to be relieved from this inequitable treatment from the date of issuance of the regulation. Any other treatment would be unfair and in violation of the spirit and purpose of the Act. A judgment should be entered declaring the regulation invalid ab initio as to complainant.