## BARRETT LUMBER & SUPPLY CO., Inc. et al. v. CLARK.

### No. 373.

United States Emergency Court of Appeals.

Heard at New York City, Dec. 17, 1947. Decided March 15, 1948.

Edward Garfield, of New York City (Fishbein and Wrubel, of New York City, on the brief), for complainants.

Josephine H. Klein, Sp. Atty., Dept. of Justice, of Washington, D. C. (Tom C. Clark, Atty. Gen., T. Vincent Quinn, Asst. Atty. Gen., and Floyd L. Cook and Charles G. Mulligan, Attys., both of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and McALLISTER, Judges.

McALLISTER, Judge.

Complainants are defendants in actions for treble damages brought against them by the United States under Section 205(e) of the Emergency Price Control Act of 1942, as amended. 50 U.S.C.A.Appendix, § 901 et seq. They filed their complaint in this court after disallowance by the Administrator of their protest against certain lumber regulations.

By their complaint, they challenge Section 4[1] of Second Revised Maximum Price Regulation 215 as contravening Section 2 (a)[2] of the Emergency Price Control Act; and they challenge Section 8[3] of the same regulation as being invalid under Sections 2 (a),[4] 2(h),[5] and 2(j) (4)[6] of the Act.

---

[1] Section 4 of Second Revised Maximum Price Regulation 215 (8 F.R. 14145) provided for establishing maximum prices for "wholesale type" sales. Complainants insist that the maximum prices in their case should have been predicated on retail sales regardless of "types of sales."

[2] Section 2(a) of the Emergency Price Control Act, in so far as here pertinent to complainants' contention with respect to Section 4 of the regulation, provides that, before issuing any regulation or order, the Administrator shall, so far as practicable, advise and consult with representative members of the industry which shall be affected by such regulation or order. 50 U.S.C.A.Appendix, § 902(a).

[3] Section 8 of Second Revised Maximum Price Regulation 215 (8 F.R. 14145) provides: "Combination grades. Lumber sold on combination grades may not be sold above the maximum price for the lowest priced grade actually named in the combination, as stated in the applicable mill regulation. But it is permissible to quote a grade with specified percentages of higher grades: Provided, That when the lumber is shipped, lumber of each grade is tallied on a board foot basis and invoiced separately at prices not in excess of ceiling prices for the respective grades."

[4] Section 2(a) of the Emergency Price Control Act, in so far as here pertinent to complainants' contention with respect to Section 8 of the regulation, provides that the Administrator may, by regulation or order, establish such maximum price or maximum prices as in his judgment will be generally fair and equitable and will effectuate the purposes of the Act. 50 U.S.C.A.Appendix, § 902(a).

[5] Section 2(h) of the Emergency Price Control Act provides: "The powers granted in this section shall not be used or made to operate to compel changes in the business practices, cost practices or methods, or means or aids to distribution, established in any industry, * * * except where such action is affirmatively found by the Administrator to be necessary to prevent circumvention or evasion of any regulation, order, price schedule, or requirement under this Act." 50 U.S. C.A.Appendix, § 902(h).

[6] Section 2(j) (4) of the Emergency Price Control Act provides: "Nothing in this Act * * * shall be construed * * * (4) as authorizing any order of the Administrator fixing maximum prices for

Stated more specifically, complainants attack the provisions of the regulation on the ground that they are not generally fair and equitable; that they compel changes in business practices, cost practices, and means or aids to distribution established in the industry, in violation of law; that the regulation fixed maximum prices for commodities in terms of specifications which were not in general use in the industry; and that the maximum prices were established by the Administrator without any consultation with representative members of the industry in question, and without consideration of any data pertaining to such industry.

Complainants are large retailers of lumber, maintaining retail lumber yards in the great metropolitan areas of the eastern cities of the United States. Prior to the late war, and during their entire business existence, they handled, almost exclusively, construction types of lumber, known generally as Common Southern Pine, Common Douglas Fir, and Western Hemlock. They sold at retail only, and their sales were large quantity sales, in keeping with the extensive operations in the construction of apartment buildings and great groups of houses in such areas. Prior to the Emergency Price Control Act and the late war, they were purchasers, as retailers, of shipments of lumber from wholesalers and the mills. They bought and sold common grades of construction lumber in large quantities. Common grades of construction lumber are those used in sheathing, roofing, beams, joists, and for similar purposes. Before the war, and before price control, when complainants would order a common grade of construction lumber such as No. 1 Common Southern Pine, the mill would ship that grade, and all higher grades "developing," at the price of that grade. By "developing" is meant any other grades that might be produced out of the log when it was sawed. In filling an order for common grades of construction lumber, the mills did not take the trouble to segregate each grade of boards as they were sawed

out of the logs. Some such boards might be of better grades than that ordered; but whatever they were, they were included in the shipment of common construction lumber. They were not separately invoiced, but were billed at the price of the grade ordered. When the retailers, or yards, sold the lumber that had been so purchased and shipped, they sold it on the same basis on which it was bought. They did not sort the shipments of construction lumber to segregate boards which might be of a higher grade than the type of lumber ordered. Before the war, the demand, seemingly, was not great for certain of the higher grades of lumber, and it might well be that in addition to the manner of filling orders as above described, a mill, when it would receive an order for common construction lumber, would use some of a higher grade off piles of lumber that it could not readily sell. When such construction lumber was sold by complainants at retail to a builder for instance, he would simply use it for general construction purposes, such as roofing or sheathing. If some boards were of a better grade than others, he, nevertheless, used them for the same purpose that he used those that corresponded to the grade ordered. The better boards, in such a case, were of no added value or utility to the builder. He was only interested in using the lumber ordered and delivered as construction lumber, for construction purposes, and for this purpose, one such board or piece of lumber, out of such a mixed shipment, was as good as another.

With the coming of the war and price control, this situation greatly changed. The common grades of construction lumber had been exclusively handled by the retail yards. Such retailers had some knowledge of, and had handled, a few grades of lumber other than construction lumber, such as some higher grades "for a special purpose," like flooring. But they had never handled, and had never heard of, a great number of different grades of lumber. However, distribution yards such as complainants' are only one segment of the lumber industry.

different kinds, classes, or types of a commodity which are described in terms of specifications or standards, unless such specifications or standards were, prior to such order, in general use in the trade or industry affected, or have previously been promulgated and their use lawfully required by another Government agency."
50 U.S.C.A.Appendix, § 902(j) (4).

The mills had always been selling numerous different grades of lumber to many classes of purchasers other than retailers, and retail lumber yards. The lumber industry generally recognized these many different grades. It had promulgated various grading handbooks defining such grades; and they were produced and sold generally by the mills—the producing segment of the industry.

When the mill regulations were established by the Administrator, these grades, appearing in the grade handbooks, which had been promulgated and had been in general use for a long time in the industry were expressly adopted by the Price Administrator, as grades in the regulation.

Upon the declaration of war, there were, immediately, huge purchases of lumber by the government. Apparently, as a result, there arose a great demand from builders and others for these various grades of lumber. It was difficult for private builders and contractors to purchase common construction lumber because of the priority right thereto of the Army and of the government generally, as well as the increased demand on the part of the public. Such private parties, therefore, it seems, resorted to buying lumber on grade, or to purchasing "combination shipments," paying for the upper grades in order to get the lower ones. They were willing to pay the higher prices for the higher grades in order to get any lumber at all. Naturally, this brought about a greatly increased market for the higher grades of lumber, and the mills, seeing that they could sell a large amount of lumber on grade, which they could not have sold before the war, naturally proceeded to segregate it and to sell it on grade. Under the new situation, when they filled orders for common construction lumber, they discontinued throwing in the higher grades with the lower, as they had before the war.

When purchasers, such as complainants, wanted to buy common construction lumber during the war and after price control became law, they couldn't secure it from the mills, for the mills no longer shipped lumber on that basis but sold it entirely on the basis of grades of the various boards or pieces of lumber making up the shipment. In other words, instead of selling a shipment of common construction lumber as they had before the war, invoicing on the basis of the specified minimum grade or better, and charging for the whole shipment at the price for such specified minimum grade, the mills now sold on grade, invoicing and charging for each separate grade of lumber that went to make up the carload shipment.

During the war, complainants' chief customer—practically their only customer—was the government. More than 90% of their sales were to the "New York Port of Embarkation, the United States Army." Most of these Army orders were emergency requisitions of lumber to be delivered within twenty-four or forty-eight hours for convoys of ships ready to sail to Europe on deadline dates. Much of the lumber in question was needed, and eventually used, for the Normandy invasion.

The Army required that the common construction lumber be invoiced on the basis of "a specified grade or better." Complainants sold it to the Army on the basis of the grade specified or better, and charged the Army the average price of the different grades. In other words, when a carload of lumber came in from the mill, each grade in the shipment was separately invoiced by the mill to complainants at the ceiling prices for the respective grades. Complainants then, without sorting the grades, averaged the mill price so charged and added to such average price the percentage markup over the mill ceiling price (which was specified in the regulation) and sold it to the Army at the average of the mill price plus this specified percentage. Such sales where in violation of the regulation heretofore set forth, which provided that lumber that was sold "on combination grades" could not be sold above the maximum price for the lowest priced grade actually named in the combination. Of course, it is to be observed that it was further provided in the regulation in question that a seller could quote a grade with specified percentages of higher grades, and charge for such different grades, provided that the lumber of each grade was tallied on a board foot basis and separately invoiced at prices not in excess of the ceiling prices

for the respective grades. But this latter provision does not concern us on this aspect of the case, because complainants did not tally any of the different grades of lumber or invoice separately for any different grades that were contained in their sales of common construction lumber to the Army. What complainants did was to sell shipments of common construction lumber, containing different grades of lumber, and charge for each grade instead of charging for the lowest priced grade named therein. This was selling shipments "on combination grades" for higher prices than the lowest grade specified therein, without complying with the provisions for tallying each grade and invoicing separately for each grade.

With the violations of the provisions of the regulation in question admitted by complainants, we come to their claim that such provisions were contrary to law.

Complainants' first contention is that the "combination grades" provision was invalid because it compelled changes in business practices in contravention of Section 2(h) of the Emergency Price Control Act, which prohibits such action except where found by the Administrator to be necessary to prevent circumvention or evasion of a regulation, order, or requirement under the Act.

Complainants declare that the "combination grades" provision of the regulation prevented them from purchasing combination grades at the mill ceiling prices for the lowest grade named therein and prevented them from securing "common construction lumber" as they did in the past. They contend that the "combination grades" provision, therefore, compelled changes in business practices. In support of this contention, they say that when a shipment of lumber would come to complainants from a mill, there was such a great variety of grades, sizes, and lengths in a carload that it was impossible to segregate the lumber into the various grades when it was unloaded; that storage facilities were wholly inadequate to store all such lumber sorted according to grade; that the practical effect of the regulation was to require such unloading and segregating and storing; and that there was not sufficient labor available during the war to perform such work, and that if there had been, the cost would have been absolutely prohibitive and prevented retail distribution yards from doing business. They conclude by declaring that while, under the regulation, they could have bought combination grades, that practically, it was impossible to buy and sell common construction lumber under this regulation and to do business in the manner in which they had carried it on prior to the coming of the war.

Moreover, it is claimed that the regulation had the effect of encouraging the mills to discontinue their practice of selling "common construction lumber" and that it was no longer possible, after price control, for retailers to buy shipments of common construction lumber which "traditionally" they had always been able to buy. Complainants aver that throughout the period during which they are charged with infractions of the regulations, they were engaged, in good faith, in giving their best efforts to the nation gripped in the crisis of war; that they were supplying with speed and efficiency the emergency requisitions of the Army, which at the very time, was poised for the decisive battles of Europe. They further say that the Army could not be delayed; that in such an emergency, it was unthinkable that the Army would have purchased construction lumber "on grade," because it would have been obliged to issue purchase orders, listing all such grades thereon, and necessarily check such grades when the lumber was delivered to the base, and make sure that each grade was delivered according to the purchase order. The Army would not have done this, say complainants, and could not have done it. It did not have the time, the facilities, or the men to do it. Complainants claim that, as patriotic citizens, they did what the Army told them to do, and they declare that, in filling the Army's orders for lumber, they were the lowest bidders. They submit that their sales of combination grades of lumber to the Army for the average price of the different grades was justified, and that the regulation prohibiting such prices was invalid. But, while complainants bought common construction lumber, mixed with the higher grades, for

the Army, it is noteworthy that the Army absolutely refused to buy and pay for such higher grades in combination shipments. This would, obviously, have been a waste of the government's money. The Army did not want or need such higher grades, and, accordingly, refused to buy on grade. It did pay the higher prices for construction lumber which were charged by complainants (through their use of the averaging method). But it is the Army that is now suing in the enforcement action for the very reason that complainants charged the government over ceiling prices for common construction lumber.

With respect to the foregoing, it appears that the "traditional" practice in the retail lumber industry was not to sell combination grades for the average price of the different grades (as complainants did in this case), but, rather, to sell for the price of the lowest grade in the combination. This practice was incorporated into the regulation, which, therefore, followed the traditional practice and preserved the industry pattern in this regard.

Here, it is to be observed that it may well be true that where the economic situation has become such that adherence to the historic pattern of industry practices results in totally changed conditions and hardships for members of an industry, it is the duty of the Administrator to evolve regulations which bring about changes in practices, rather than to follow the pattern. That, seemingly, is one of the contentions of complainants herein. What requirements, it may be asked, could have been included in the regulations which would have enabled complainants to secure common construction lumber, as they did before the war, without being charged the higher price for every higher grade included in such shipment?

Complainants submit that the Administrator should have required in the regulation that the mills sell the same percentage of their output at the same prices at which it had been traditionally sold during a representative period of time; and that, if mills had sold a certain percentage of their output as a certain grade or better, charging only the price for the grade specified, they should have been compelled to continue to sell on that basis during price control. It is also suggested by complainants that, in order to carry out the objectives which, complainants contend, would have preserved the traditional type of sales, the Administrator should have provided that, generally speaking, mills could only sell lumber graded as common construction lumber, unless proof were supplied that the higher grades were actually necessary for certain ultimate consumers, and that such consumers really needed such higher grades for a definite and specified purpose. "Average pricing" of combination grades—such as was actually practiced by complainants in this case—is also advanced in complainants' argument as a method which should have been adopted by the Administrator as a solution of the difficulties which confronted the complainants in their sales of lumber.

In considering these proposals of what the Administrator should have required in order to enable retailers to secure common construction lumber, as they had before the war, we do not see how the Administrator could compel the mills to include their higher grades of lumber in shipments of common construction lumber and require them to sell such a combination shipment at the price of the lower grades. The mills, because of increased demand, had a market for the higher grades at the higher prices. There was no justification in the Emergency Price Control Act for prohibiting sales of the better grades at prices higher than the prices fixed for the lower grades.

Complainants' contention that the Administrator should have required proof of need on the part of purchasers of the higher grades is obviously based on the theory that by so constricting the sales of the higher grades of lumber, there would remain a large surplus of such grades which the mills would continue to use in making up shipments and filling orders for lower grades, such as construction lumber, and that, as a result, the prewar situation would remain unchanged. But the administrative burden involved in any requirement that official approval be secured for sales of higher grades of lumber on the basis of need would have been overwhelming; and a requirement that sellers satisfy themselves

as to the actual need of the purchasers for the higher grades would in all probability have been an unreasonable and impossible burden on the sellers. If the mills could successfully sell all the various kinds of lumber on grade—as they were actually able to do—it is difficult to see how any staff of the Office of Price Administration, no matter how large, could have enforced a requirement that actual need must be demonstrated before a sale of the higher grades of lumber could have been made to a buyer. Moreover, this kind of a provision had already been found to be ineffective by the industry advisory committee that considered the matter. As to the suggestion that an average pricing requirement should have been included in the regulation, this possibility had also been thoroughly explored with the industry advisory committee and rejected by it. The committee, as late as May, 1945, could reach no agreement on a satisfactory alternative to Section 8 of the regulation, here in question, providing that lumber sold on combination grades could not be sold above the maximum price for the lowest priced grade named in the combination; and it finally recommended that this section of the regulation be left unchanged. It can hardly be maintained, where the leaders and representatives of an industry having this very question in hand took the stand that it would have been ineffectual to require a showing of need on the part of buyers of higher grades of lumber, and, furthermore, rejected a proposal for so-called average pricing—at the same time recommending that there be no change made in the regulation here complained of—that the Administrator should be held guilty of arbitrary, capricious, and unlawful conduct in following and abiding by such judgment—especially where the industry itself could not solve the difficulties or suggest regulations for what complainants themselves call "an insoluble problem."

It is not to be overlooked that complainants make a strong and persuasive showing that there were very great difficulties in sorting the lumber from shipments which they purchased from the mills, and that the invoices, submitted by them on the hearing below, disclose an excessive mixing of grades in such shipments. But it appears from the evidence that there was available plenty of lumber, grade marked by the mills, that could be secured in various parts of the country. Complainants say, however, that they could not have sorted all these mixed shipments, inasmuch as, because of labor shortages created by the war, they had not sufficient personnel to do the work, and, in addition, they did not have enough facilities and space to unload and store the lumber prior to its sale. It is true that machinery can be used to unload carloads of common construction lumber, if they are not sold on grade, while it is necessary to unload, sort, and segregate the various types of lumber, by hand labor, if sold on grade. However, complainants operated retail distribution yards. A retail distribution yard is defined in Section 16(a) of Second Revised Maximum Price Regulation 215 as "a wholesale or retail lumber yard which gets lumber from mills or other yards; unloads, sorts, and resells or redistributes it; which regularly maintains a varied stock of lumber from different regions; which gets its lumber, except for local species, mostly by rail and sells mostly for truck shipment; which is equipped to make quick deliveries of many different items of lumber; and which has been located as its particular site in order to be near a lumber-consuming area." See Vanlandingham v. Clark, Em.App., 1947, 163 F.2d 896.

In effect, complainants, therefore, attack the regulation because of the fact that, in order to comply with it, they would have been obliged to carry on the activities which distribution yards, such as they are, historically performed. These contentions, we find, are untenable.

But it is said that the Army desperately needed the lumber which complainants furnished and sold to it; that the Army could not have waited, and would not have stopped fighting the war simply because of the delays and difficulties brought about by the classification of the grades of lumber and selling agencies, and the imposition of price control; and that complainants performed a patriotic duty in getting and delivering the construction grades of lumber required by our fighting forces for the in-

vasion of Europe. But complainants, in spite of their efforts, were not themselves fighting the war; they were not the Army, or a part of it, or agents for it. They were sellers of lumber to the Army, which now charges them with violation of the price control laws in selling to it at prices in excess of the maximum prices provided thereunder. As to the arguments of urgency and necessity, if complainants, or other retailers, had not been able to sell shipments of construction lumber to the government at the price of the lowest grades described therein, and if the Army could not have secured such lumber from the mills without being required to pay prices higher than set for the grades they required, it might well be that the government would have been enabled to seize such lumber or even to have taken over the mills in the crisis of the war. But complainants cannot be absolved from the penalties of selling above maximum prices to the Army, even though their conduct helped in the war effort—and it does appear that they rendered great and valuable services to the Army and to the nation, and that these services, primarily, were based upon patriotic motives. Their consideration of profit seems to have been minor, faint, and peripheral. But they were under no obligation, legal or moral, to supply the Army with lumber at the expense of violating the provisions of the price control law.

From the foregoing, it is our conclusion that the Administrator, in the provisions of the regulation under attack, changed no business practices, imposed no new specifications or standards theretofore unknown, but rather followed the historic pattern of the industry.

It is regrettable from the standpoint of complainants that they did not address their objections and recitals of hardship and difficulty to the Administrator through industry committees, or informally by letters, or formally by protest, before the making of the sales here in controversy. However, it might well have been that no remedy could have been afforded them, in view of the fact that the industry committees which were consulted made no recommendations to set aside or modify the provisions of the regulation in question.

In this regard, it seems pertinent to observe that, while the basic requirement of the price control act is that a regulation be generally fair and equitable in its industry-wide application, "Congress recognized that a regulation conforming to this general standard might cause unnecessary hardship in special or atypical situations which perhaps were not even in the contemplation of the Price Administrator at the time he promulgated the regulation. Accordingly it was provided in § 2(c) of the Act, 50 U.S.C.A.Appendix, § 902(c), that regulations 'may contain such classifications and differentiations, and may provide for such adjustments and reasonable exceptions, as in the judgment of the Administrator are necessary or proper in order to effectuate the purposes of this Act.'" Utah Junk Co. v. Fleming, Em.App., 1946, 159 F.2d 440, 444.

In Adams, Rowe & Norman, Inc., et al. v. Bowles, Em.App., 1944, 144 F.2d 357, 360, it was said: "We are confident that Congress intended, not only that the regulations should be 'generally fair and equitable,' but that it should be the duty of the Administrator under § 2(c) to avoid or eliminate manifest inequities in exceptional classes of cases so far as this might reasonably be done consistently with the main objective of the Act and with the effective administration of the stablization program."

A regulation is not invalid ab initio for failure to make particular provision for special or local situations which might properly have been taken care of by the Price Administrator pursuant to his authority under Section 2(c) and he cannot be held to have acted arbitrarily or capriciously in failing to grant special relief under such section until the equities of the particular situation are made known to him. It is only when such situations are brought to the attention of the Price Administrator by the filing of the protest that he can be said to act arbitrarily and capriciously in denying the relief that he is empowered to grant under Section 2(c) of the Act. Not until then does a regulation which is generally fair and equitable become invalid in its application to a particular complain-

ant. Utah Junk Co. v. Fleming, Em.App., 1946, supra, 159 F.2d at page 444.

Complainants vigorously argue that it is sophistry to say that the situation to which they object was caused by the change in demand rather than by the regulation itself. They declare that provisions in the regulation generated an incentive for the mills to discontinue their former combination grades, priced as construction grades; and that the regulation encouraged the mills to sell combination grades at the price of each grade described therein. In this contention, complainants allude principally to a certain "mixed car premium," which granted the mills a certain addition in price for such mixed car shipments. This premium, however, followed historical practice, but was soon removed when it was found ineffectual and injurious. It was not due to the regulation, but because of a shift in demand, that the mills commenced to sell all lumber shipped in combination grades at the price of each grade in such shipment. The regulation did not create the demand for the higher grades. That resulted from the whole war economy—the tremendous purchases of lumber by the government, and the fact that purchasers who formerly bought lower grades were compelled to buy higher grades to get any lumber whatever. War always brings about scarcity of supply for civilian purchasers and consumers. With scarcity of supply comes increased demand. The government in this case says, with a show of reason, that large volume purchasers, like complainants herein, contributed to this situation—that is, the creation of the increased demand for various grades—by purchasing lumber on this basis. It was not the regulation but the shift in demand, with the coming and the waging of the war, that gave the mills their opportunity to sell; and caused them to sell all their lumber products, on grade.

Complainants further contend that the regulation was not generally fair and equitable to the extent that it limited them to wholesale markups in sales to the government instead of allowing them the higher retail markups, inasmuch as, historically, they had been retail yards and presumably came under such classification according to the lumber regulations.

The distribution yard regulation, here relevant, established maximum prices by reference to the type of sale made rather than by reference to the type of seller. The statement of considerations accompanying the regulation in question observed that the conditions incident to the sale rather than the status of the dealer, wholesale or retail, governed the applicability of the regulation, and that this was necessitated by the absence of any clear line between the levels of distribution. It went on to say that the line between wholesalers and retailers had been disappearing as the market for lumber had shifted from private construction to large government contracts, and that, in the circumstances, it would be unsound and unfair to set one maximum price for a "wholesale yard" and a different one for a "retail yard" when both made sales which were identical as to size and class of purchasers. It was stated that classification by sales, by quantity and class of purchaser was based upon industry practice in the lumber yard business, and that for many years it had been a widely accepted understanding that certain purchasers were wholesale purchasers, and others were not. Because, as was observed, this understanding had been confirmed at an industry meeting held by the Office of Price Administration, the regulation applied a wholesale type of markup to the price of sale to the wholesale type of purchase, although no reference was made in the regulation to any distinction between wholesaler and retailer as such. See Section 4, Second Revised Maximum Price Regulation 215. Such sales to the government were defined as wholesale type sales. See Section 16(g) (1) of Second Revised Maximum Price Regulation 215. From everything that appears in the case, the classification of such sales as wholesale type sales and the limitation of complainants to wholesale markups in such sales rather than the allowance of retail markups, was a reasonable exercise of the powers of the Administrator. Even after the war, at a meeting of the industry advisory committee, it was expressly stated that the purchases by the government should be properly considered as wholesale purchases, and that "if the war effort is continuing in any way whatever," the government, in its direct

purchases of lumber from any kind of seller, was to be classified as a wholesale purchaser. As far as the sales made by complainants to builders and contractors were concerned, these were still considered retail sales, as they were historically, and complainants were entitled to retail markups thereon in accordance with past practice.

To complainants' objections that it was unreasonable and unfair to establish the level of markups for wholesale type sales from figures taken from wholesale distribution yard operations without including therein retail yard operations, the Administrator commented in his statement of facts, officially noticed that it would be difficult if not impossible to make a cost study which would determine a retail lumber yard's costs of making wholesale type sales inasmuch as all of the facilities of a retail lumber yard are used for making both retail type and wholesale type sales in addition to other types of building materials. It was observed that in carrying out such a cost study, an allocation of costs between the types of sales would be necessary and that an allocation of overhead costs, for instance, would be entirely speculative. However, the persuasive consideration on this point is that the burden of proving that the regulation was not fair and equitable in this respect was upon complainants. Although they were specifically granted an opportunity to present evidence or submit any financial data to support allegations of hardship imposed upon them individually, they declined to do so. We cannot say that they have met the burden of establishing that the regulation in question was not generally fair and equitable.

One of the complainants was also sued for violation of Second Revised Maximum Price Regulation 19, which is the mill regulation applicable to sales of Southern Pine. This complainant was charged with making direct mill sales in excess of the maximum price. The defense is made that this mill regulation was invalid because it denied complainant a markup over mill ceiling prices in direct mill sales. But markups were properly given according to the service rendered. Did complainant, in direct mill sales, render more service than the mill itself in making such a sale? There

was no showing of invalidity in the Administrator's allowing the same markup to a mill making a direct sale as was allowed to complainant when making such a direct sale. A sale made by complainant out of its distribution yard is entirely different from a direct mill sale negotiated by it. The pattern of the regulation was to grant the same maximum price to all classes of sellers performing the same function in the system of distribution. If complainant performed some slight service in connection with its direct sales from the mills which the mills did not perform when making such direct sales themselves, it does not appear that there were substantial differences between the services rendered to the purchasing public—especially during the war— to justify the allowance to complainant of a markup over the mill ceiling prices for direct mill sales.

Where the sale of direct mill shipments did not require any of the usual services furnished by retail yards and such services were, accordingly, not in fact furnished, it was not unreasonable for the Administrator not to permit an allowance for such service in the maximum prices which he established for direct mill sales by retail distribution yards. See Vanlandingham v. Clark, supra.

In this case, there has been no proof that the markups allowed to the complainant in question were not adequate to compensate it for its costs and for the performance of its services and functions. Where a similar point was at issue in Safeway Stores v. Bowles, Em.App., 1944, 145 F.2d 836, 845, the court remarked that the complainant therein had not shown that the markups which the Administrator had incorporated into the regulations, after considering the data and carrying through the procedures which complainant attacked, were themselves not generally fair and equitable, or such as would effectuate the purposes of the Act. "On that ground alone," it was said, "the complaints would have to be dismissed." If, in determining the markups, the Administrator exercised his judgment and complied with the mandatory procedural requirements of the law, the court could not set aside the regulation on the ground that it was formulated upon inadequate data, unless the markups themselves

were not generally fair and equitable, or not calculated to effectuate the purposes of the Act. As the court observed: "It must be remembered that the Emergency Price Control Act imposed upon the Administrator the Herculean task of stabilizing the price structure of a great nation and of doing so with unprecedented speed under the immediate threat of inflation. We think that under such circumstances the Administrator is entitled to be judged by the results of his acts and not to be subjected retrospectively in the calm of the judicial study to a hypercritical appraisal of the reasonableness of each of the steps by which, under the stress of the emergency, his acts were decided upon."

The proofs of complainants do not show that the regulation was invalid in generally establishing the same prices for all types of sellers of direct shipments from the mills to consumers.

Complainants herein have not sustained the burden of proving that the regulations here under attack were not generally fair and equitable, nor have they established that the action or conduct of the Administrator was arbitrary and capricious.

The remaining contentions of complainants, directed to other aspects of this controversy, have been considered, but we have come to the conclusion that they are not meritorious and do not require further discussion in our determination of the case.

In accordance with the foregoing, a judgment will be entered dismissing the complaint.