## PUBLICKER INDUSTRIES, Inc., v. FLEMING.

### No. 252.

United States Emergency Court of Appeals.

Heard at Washington, D. C., Dec. 7, 1946.

Decided May 31, 1947.

As Amended on Denial of Rehearing July 10, 1947.

Robert W. Lishman, of Washington, D. C. (Knox, Matthews & Lishman and Wil-

liam H. Matthews, Jr., all of Washington, D. C., on the brief), for complainant.

Carl A. Auerbach, Acting General Counsel, of Washington, D. C. (William R. Ming, Jr., Chief, Court Review Price Branch, of Washington, D. C., and Seymour Friedman, Sp. Asst. to Associate General Counsel, of Arlington, Va., all of Office of Price Administration, on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and LAWS, Judges.

MARIS, Chief Judge.

 Maximum Price Regulation No. 28 Ethyl Alcohol (Excluding West Coast Ethyl Alcohol) as amended by Amendment 10[1] established maximum prices for all ethyl alcohol from grain sold by producers to Defense Supplies Corporation and was effective during the period from November 11, 1944 to September 30, 1945. Publicker Industries Inc., one of the largest producers of ethyl alcohol from grain in the country, protested the regulation as amended and the protest was denied. Publicker thereupon filed a complaint in this court, asserting, inter alia, that Amendment 10 was void for failure of the Administrator to consult with the industry prior to its issuance, that the complainant was denied a fair hearing because it was not permitted to present oral evidence, that MPR 28, in the light of Amendment 10, was not generally fair and equitable and that Amendment 10 and MPR 28 as amended by Amendment 10 unlawfully discriminated against the complainant. In its brief, however, the complainant restricted its argument to the single contention that Amendment 10 and MPR 28 as so amended discriminates against the complainant without reasonable basis. We shall accordingly restrict our consideration to this single issue.[2]

Price control for alcohol, whether produced from molasses or grain or synthetically, was initiated in September, 1941 with the issuance of Price Schedule No. 28[3] and continued by Revised Price Schedule No. 28[4] with dollars-and-cents maximum prices. Amendment 2 to RPS 28,[5] however, provided that certain beverage distilleries which had converted to the production of industrial alcohol might elect in lieu of the dollars-and-cents maximum prices to sell at prices established by a cost-plus pricing formula. The formula provided 4 cents per gallon profit and permitted allowances for specified costs, among them being the actual general and administrative expenses not in excess of 3 cents per gallon. Maximum Price Regulation No. 28,[6] which succeeded Revised Price Schedule No. 28, restricted the privilege of the cost-plus pricing method of establishing maximum prices to those converted alcoholic beverage distilleries which produced less than 15,000 gallons of ethyl alcohol per day. Amendment 3 to MPR 28[7] established a uniform cost-plus pricing provision applicable to all plants producing ethyl alcohol from grain, whether industrial plants or converted beverage distilleries. It introduced for the first time in alcohol price control a sliding scale of profit allowances formula, which was substituted for the flat 4 cents per gallon profit allowance. Each producing plant was permitted 4 cents per gallon profit for the first 750,000 gallons produced quarterly, 3 cents per gallon for the next 750,000 gallons, and 2 cents[8] per gallon for all volume in excess of 1,500,000 gallons. The producer was permitted to include as costs a fixed allowance of 3 cents per gallon to cover general and administrative expenses without regard to actual expenses incurred for that purpose. By governmental regulation all ethyl alcohol produced at this time had to be sold to Defense Supplies Corporation. The prices charged to De-

---

[1] 9 F.R. 13209, issued November 6, 1944.

[2] Rule 21(g) of this court provides: "Objections stated in the complaint but not presented in the brief may be disregarded by the court." 50 U.S.C.A.Appendix, following section 924.

[3] 6 F.R. 4761, issued September 15, 1941.

[4] 7 F.R. 1257, issued February 17, 1942.

[5] 7 F.R. 7401, issued September 17, 1942.

[6] 8 F.R. 2339, issued February 22, 1943.

[7] 8 F.R. 9016, issued June 28, 1943.

[8] Increased to 2½ cents per gallon by Amendment 4, issued September 20, 1943. 8 F.R. 12879.

744

fense Supplies Corporation remained subject to audit by the Office of Price Administration. Amendment 10 to MPR 28, the amendment under attack, changed the allowance for general and administrative expenses from the flat 3 cents per gallon to reimbursement for general and administrative expenses actually incurred, not to exceed 3 cents per gallon. Amendment 13 to MPR 28[9] with exceptions not here pertinent removed ethyl alcohol from price control.

The complainant and its wholly owned subsidiaries owned and operated an industrial alcohol plant at Bigler Street, Philadelphia, converted from molasses to grain and having an annual capacity of approximately 75,000,000 gallons, an industrial alcohol plant at Tasker Street, Philadelphia, converted from molasses to grain and having an annual capacity of approximately 10,000,000 gallons, a registered distillery at Snyder Avenue, Philadelphia, converted from production of beverage distilled spirits to production of alcohol, and having an annual capacity of approximately 17,600,000 gallons, and a registered distillery at Linfield, Pennsylvania, converted from production of beverage distilled spirits to production of alcohol, and having an annual capacity of approximately 1,200,000 gallons. It produced at these four plants approximately 100,000,000 gallons of industrial alcohol annually. The complainant's four principal competitors, Schenley, Seagram, National Distillers and Hiram Walker, referred to as the "Big Four", collectively produced at 42 plants approximately 130,000,000 gallons of industrial alcohol annually. The complainant accounts for a little more than 20% and the "Big Four" account for a little less than 30% of the total national output of industrial alcohol.

The general and administrative expenses of the complainant were less than the 3 cents per gallon allowed by Amendment 3 to MPR 28. During the effective period of that amendment, therefore, the complainant's direct profits per gallon were supplemented by the difference between the flat 3 cents per gallon allowance and its actual general and administrative expenses. Each of the "Big Four" on the other hand incurred general and administrative expenses which more nearly equalled the 3 cents per gallon allowance so that to them the allowance represented reimbursement for costs rather than additional profit per gallon. As a result, even though the sliding scale formula of Amendment 3 provided for a lower per gallon profit for the complainant than for its competitors, its final profits per gallon were comparable to theirs because of the savings made available to the complainant by the provision for a flat 3 cents per gallon general and administrative expense allowance. When Amendment 10 changed the expense allowance so that the producer could no longer gain any advantage from the fact that its general and administrative expenses were less than 3 cents per gallon, the impact of the change was felt most by the complainant, which had previously been the chief beneficiary.

The complainant, deprived by Amendment 10 of the benefit of the flat 3 cents per gallon allowance, was thus for the first time subjected to a regulation which established maximum prices by a sliding scale formula without any ameliorating provision. It was this regulation which, the complainant contends, was unlawfully discriminatory in operation.

The Administrator does not deny that the average profit per gallon of grain ethyl alcohol received by the complainant after the effective date of Amendment 10 was less than the average profit per gallon received by each of the four principal competitors nor does he deny that the amendment cut the complainant's profits more heavily than it did those of its competitors. He takes the position that if the regulation as amended established maximum prices by the use of classifications which were reasonable and designed to effectuate the purposes of the Act and if the prices so established were nondiscriminatory the mere fact that the regulation bore more heavily upon the complainant than upon its competitors does not render it invalid.

---

[9] 10 F.R. 12960, issued October 17, 1945.

■ At the time when the Administrator promulgated Amendment 10 the need to encourage increased production, which primarily motivated the promulgation of Amendment 3, was no longer so pressing as to eclipse all other considerations. Alcohol plants had been converted from the production of alcoholic beverages to the production of industrial alcohol, and from the use of molasses to that of grain. Each plant had achieved almost peak production so that establishment of higher maximum prices for industrial alcohol could not result in appreciably greater production. The Administrator was, therefore, for the first time in a position to perform his duty of establishing maximum prices for industrial alcohol in the light of the purposes of the Act other than that of procuring maximum production. Those purposes as expressed in Section 1(a) were, inter alia, to prevent abnormal increases in prices, to eliminate and prevent profiteering, and to assure that defense appropriations were not dissipated by excessive prices. We think that it was entirely reasonable for the Administrator to seek to accomplish these purposes by the use of a pricing formula which would assure generally to the group of industrial alcohol producers owning their own plants a substantially uniform rate of return on the capital invested in their plants while at the same time it would pass on to the United States, as sole purchaser of the entire output, most of the savings effected by large scale production.

■ The fact that the Administrator based his graduated pricing formula upon plant capacity instead of directly upon capital investment does not alter the reasonableness of his regulation. In doing so the Administrator took notice of the economic fact that in the alcohol industry capital investment per gallon of annual capacity in a plant decreases with increasing total investment in the plant so that if a producer operates one large plant at capacity to produce the same volume of alcohol which another producer can produce only by operating four smaller plants at capacity, the former's total investment will be less than the latter's. He asserts that this is the result of the economic principle of

mass production and is supported by the results of a study of the alcohol industry which indicated that small plants whose average annual capacity per plant was 1,075,500 gallons had a capital investment of 20 cents per gallon, medium plants whose average annual capacity per plant was 9,284,100 gallons had a capital investment of 10.8 cents per gallon, and large plants whose average annual capacity per plant was 53,000,000 gallons had a capital investment of 4.3 cents per gallon. The complainant has attacked the accuracy of this study but we think it sustains the Administrator's contention. It follows that a regulation which graduates the rate of profit per gallon in conformity with plant capacity, permitting the highest rates to the class comprised of plants with the least capacity and the lowest rate to the class having plants with the greatest capacity, cannot be characterized as on its face unreasonably discriminatory. Moreover there is the obvious advantage of simplicity in administration inherent in a regulation which allows a fixed profit per gallon easily ascertainable at the time of sale.

■ Nonetheless the question remains whether the graduated scale of profit fixed by the regulation did in fact discriminate against the complainant as owner of the largest plants in the industry by denying to it in practice a rate of return on its investment comparable to that enjoyed by the smaller producers which owned their own plants. If so the regulation might well be invalid as to the complainant, as the latter strongly urges. The burden of proving the facts upon which the alleged invalidity is based is upon the one who challenges the regulation, however. Montgomery Ward & Co. v. Bowles, Em.App. 1943, 138 F.2d 669, 671; Cudahy Bros. Co. v. Bowles, Em.App.1944, 142 F.2d 468, 470. We turn, therefore, to an examination of the facts bearing upon the issue of unlawful discrimination.

A comparison between the rate of return received by the complainant upon its capital investment and that received by its competitors would lend support to the claim of discrimination if it were to appear that following Amendment 10 the complainant's

rate was reduced substantially below that of its competitors. Unfortunately for the complainant, despite the mass of statistical data in the record, it is not possible to make such a comparison because a careful examination of the record discloses no evidence as to the rates of net return upon the investment of any one of the "Big Four" subsequent to Amendment 10.

The complainant asserts that during 1943 its rate of net return upon its net worth was 75.54% and that during the first 9 months of 1944 it was 31.33% whereas the average rate of net return upon net worth of the "Big Four" was 42.3% in 1943 and 53.7% in 1944. It may be suggested that this calls for the conclusion that the complainant's rate of net income upon net worth was substantially lower in 1944 because the 3 cents general and administrative expense allowance was taken away in that year whereas it was in 1943 that the 3 cents allowance was granted and that the rate of net income upon net worth of the "Big Four" was higher in 1944 than in 1943 because no part of the 3 cents allowance represented profit to them. The statistics referred to would not support such a conclusion. The returns for each of the "Big Four" from which the rates above mentioned were derived were for the fiscal year rather than for the calendar year 1944. Thus Seagram's fiscal year ended July 1, 1944, Schenley's ended August 31, 1944, Walker's ended August 31, 1944 and National's ended September 30, 1944. The rate of 31.33% stated above for the complainant was based upon returns for the year 1944 with the last quarter excluded. As we have seen, the effective date of Amendment 10 was November 11, 1944. It is, therefore, apparent that the rates of return based upon returns for a portion of the year prior to the effective date of Amendment 10 did not and could not reflect the impact of Amendment 10 upon the complainant and its competitors. It follows that such data of itself cannot be made the basis of a finding that Amendment 10 gave preferential profit treatment to the complainant's competitors and thus unfairly discriminated against the complainant.

Careful scrutiny of the statistics in the record reveals that a factor other than the impact of Amendment 10 was probably responsible for the fluctuation in the rates of return. In the calendar year 1944 but excluding the last quarter the rate for the complainant was 31.33%. In the calendar year 1944 including the last quarter the complainant's rate was 63.42%. It thus appears that the complainant's return for the last three months of the calendar year 1944 was more satisfactory than for the preceding nine months although the return for approximately two of the last three months was subjected to the allegedly adverse effects of Amendment 10, whereas the return for the first nine months was earned under the influence of the fixed 3 cents per gallon allowance for general and administrative expenses. The Administrator suggests that the more logical explanation for the fluctuation in rates of return shown by the statistics is that they varied so radically not because of the effect of Amendment 10 but because of the variation in the volume of sales of beverage alcohol during the respective periods. Since it appears that beverage alcohol sales were more profitable to the producer than industrial alcohol sales it is quite understandable that the greater the volume of beverage alcohol sold by a producer the higher would be its rate of return upon capital investment. Whether or not this is the correct explanation is, of course, speculative but surely no less so than is the explanation advanced by the complainant.

If the most significant element in the rate of return is the volume of beverage alcohol sales as compared with the volume of industrial alcohol sales it is interesting to note that, whereas in the calendar year 1944 the dollar sales of industrial alcohol accounted for 44.7% of complainant's gross dollar sales, it accounted for but 12.3% of Seagram's, 6.71% of Schenley's, 10.02% of Hiram Walker's and 12.92% of National Distillers'. Each of the "Big Four" must, therefore, have sold proportionately more beverage alcohol than did the complainant and for that reason may well have increased its rate of profit for the calendar year 1944 to a greater degree than did the

complainant. The statistical data, therefore, are without determinative value upon the issue whether after Amendment 10 the complainant's rate of return on investment in fact was reduced below the comparable rate for its competitors and, whether if there was such a reduction it was due to the use by the Administrator of the graduated scale of profit allowance in the regulation.

The complainant quotes from the Administrator's statement of considerations accompanying Amendment No. 3 and urges that the quoted portions prove conclusively that the Administrator was himself of the opinion that were it not for the 3 cents per gallon allowance for general and administrative expenses, the sliding scale profit formula would discriminate arbitrarily against plants producing a large volume of industrial alcohol. We do not so read the statement of considerations. The quoted portions read in their proper setting are expressions by the Administrator that the maximum prices established by the formula would meet the statutory requirement and be generally fair and equitable for the industry as a whole and that the flat 3 cents per gallon allowance merely gave an extra margin of safety for the large volume plants. By the time Amendment 10 substituted the actual costs in lieu of the flat allowance the industry as a whole was operating at a level so far above the minimum standard required to make the regulation generally fair and equitable that there was no need to continue the precautionary flat 3 cents per gallon allowance. Nor does the complainant claim that the maximum prices established for it under the regulation as amended by Amendment No. 10 are not generally fair and equitable. Indeed it would be difficult for it to do so in view of its own experience. For the figures in the record indicate that its net return on capital investment increased from 2.75% in the prewar period 1936–1939 to more than 21% in the year 1945.

We are not persuaded by the complainant's attack upon the regulation to the effect that the Administrator is unlawfully attempting to control profits rather than to regulate prices. Any cost-plus pricing technique necessarily involves the fixing of profits as an element. The concern with that element is particularly appropriate in a case such as this. The complainant's entire output of grain ethyl alcohol, as well as that of the other producers, was purchased by the United States through its agency, Defense Supplies Corporation, which in case of the termination of the contract agreed to purchase the producer's inventories of grain and molasses. The right to reject any part of the output was limited to alcohol so deficient with respect to specifications as to be unsalable without further processing. It will thus be seen that the financial risk to the producer though not eliminated was drastically reduced since the producer was not only guaranteed his cost but also his profit.

We conclude that the complainant has completely failed to prove that the maximum prices established by MPR 28 after Amendment 10 were arbitrary or capricious.

A judgment will be entered dismissing the complaint.