**VANLANDINGHAM v. CLARK, Director, Division of Liquidation, Department of Commerce.**

No. 354.

United States Emergency Court of Appeals.

. Heard at Chicago, Ill., Sept. 6, 1947.
Decided Oct. 27, 1947.

Joseph J. Strasburger, of Chicago, Ill. (Alan J. Altheimer and Mayer, Altheimer & Kabaker, all of Chicago, Ill., on the brief), for complainant.

Josephine H. Klein, Atty., Dept. of Justice, of Washington D. C. (Tom C. Clark, Atty. Gen., and Floyd L. Cook, Charles G. Mulligan, and Henry H. Schneider, Attys., Department of Justice, all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and McALLISTER and LINDLEY, Judges.

McALLISTER, Judge.

Complainant is a wholesale dealer in lumber, located in Chicago, Illinois. In the past, his customary practice has been to purchase lumber directly from the mills and to assemble and transport it in amounts required by retailers. Prior to Government price control, complainant received a discount from the mills averaging 8% of the sale price of the lumber to him.

Maximum prices were established for various kinds of lumber by the Price Administrator, acting pursuant to the Emergency Price Control Act, 50 U.S.C.A.Appendix, § 901 et seq. Six of the regulations involved in this controversy established maximum prices governing sales of lumber by mills to purchasers without specifying any amount for discounts for wholesalers. Revised Maximum Price Regulation No. 26 —Douglas Fir and other West Coast Lumber;[1] Maximum Price Regulation No. 94— Western Pine and Associated Species of Lumber;[2] Revised Maximum Price Regulation No. 94;[3] Maximum Price Regulation No. 290—Sitka Spruce Lumber;[4] Revised Maximum Price Regulation No. 290;[5] and Maximum Price Regulation No. 402— Western Red Cedar Lumber.[6] Two of the regulations, on the other hand, permitted wholesalers of Southern Pine Lumber to charge 6% over mill maximum prices. Revised Maximum Price Regulation No. 19— Southern Pine Lumber;[7] and Second Revised Maximum Price Regulation No. 19.[8] It was not until after the period here in question, on March 8, 1946, that the Administrator issued Supplementary Order No. 150,[9] allowing wholesalers a markup of 5% on all kinds of lumber. During the effective periods of the above regulations, complainant was charged with selling 325 carloads of lumber at a price in excess of the maximum prices established by the Administrator, during the period between August 18, 1943 and August 18, 1944. A judgment was entered against him for the amount of the overcharge in the district

[1] 8 F.R. 7570.
[2] 7 F.R. 10848.
[3] 9 F.R. 6634.
[4] 8 F.R. 19.
[5] 9 F.R. 5727.
[6] 8 F.R. 7662.
[7] 8 F.R. 5536.
[8] 9 F.R. 1162.
[9] 11 F.R. 2513.

court and is now pending on appeal in the United States Circuit Court of Appeals for the Seventh Circuit. The present controversy arises as a result of a complaint filed in this court attacking the validity of the pertinent price regulations.

Complainant contends:

1. That the regulations in controversy unlawfully deprive lumber wholesalers and commission salesmen as a group of their normal peacetime earnings during the period from August 18, 1943, to August 18, 1944;

2. That the regulations discriminated unlawfully in favor of mills and wholesale distribution yards and against wholesalers and commission salesmen of lumber;

3. That the regulations discriminated unlawfully in favor of wholesalers and commission salesmen of Southern Pine lumber and against wholesalers and commission salesmen of other species of lumber;

4. That the regulations were unlawfully used and made to operate to compel changes in the business practices and means or aids to distribution established in the lumber industry.

To sustain his claim that the regulations were not generally fair and equitable, in that they deprived lumber wholesalers and commission salesmen, as a group, of their normal peacetime earnings during the period from August 18, 1943 to August 18, 1944, complainant urges that the regulations should have provided an amount for wholesalers and commission salesmen by way of a markup over the maximum selling prices established for the mills. All the regulations (except those for Southern Pine, not involved in this discussion) provided the same ceiling prices for sales of lumber traveling from the producing mill to the purchaser, and not becoming a part of the stock in a lumber distribution yard. For sales by such yards, the ceiling prices were different. But we are not immediately concerned with that phase of the case.

A brief survey of the background of this case may be helpful to an understanding of the issues involved. Before the coming of Government price control, the mills had made use of all possible methods to sell and distribute their products to the public, and for this purpose, availed themselves of the services of wholesalers, commission salesmen, and wholesale distribution lumber yards. In those years, it appears that from 65% to 75% of all softwood lumber was sold through wholesalers. Here it may be observed that although wholesalers and commission men operate in much the same way, a wholesaler, such as complainant is, purchases lumber from the producing mills, taking title and assuming credit risks upon resale, and resells the lumber, usually in carload lots, principally to retail yards and large industrial consumers. Wholesalers do not maintain yards, and usually do not physically handle the lumber. Ordinarily, it is shipped directly from the mill to the wholesaler's customer pursuant to an order placed with the mill by a wholesaler. Commission salesmen differ from wholesalers in that they do not take title to the lumber. They customarily sell the lumber in the name of the mill and do not assume credit risks.

With the advent of war and the carrying on of the gigantic industrial operations in support of our military effort, changes naturally occurred in the purchase and distribution of lumber. As one instance, the Central Procuring Agency of the United States Government became the largest single purchaser of lumber from the mills. Everyone was trying to secure the commodity in increasing quantities. Retail dealers in lumber and large consumers of lumber took employees into their organization, whose duties were to procure lumber directly from the mills.

Complainant says that by reason of the regulations, the mills bypassed the wholesaler and commission men and enabled the mills to sell directly to the public at the maximum prices, because of the wartime scarcities; and that the regulations further prevented the wholesalers and commission men, under the above circumstances, from rendering services for, and becoming agents of, small retailers and others in finding and procuring lumber for them, inasmuch as they prohibited wholesalers and others from selling at prices above the

mill ceiling or maximum prices, or receiving compensation for procuring lumber unless they were employees of such companies. Not only is it claimed that the regulations were invalid for not permitting a markup to such wholesalers, but it is further asserted that the Administrator made the matter worse by his subsequent action with regard to the traditional discounts and commissions which had been granted in the past to wholesalers and commission men, before price control. These discounts and commissions were included by the Administrator in the original mill ceiling, or maximum, prices; but it is claimed that as the mills themselves proceeded more and more to sell directly to the public at the maximum prices, and to bypass wholesalers and commission men, the Administrator, in subsequent adjustments of mill ceiling prices, failed to take the traditional discounts and commissions into consideration as an element of cost to the mills and narrowed the mills' margins of profits accordingly, thereby depriving the wholesalers and commission men of all opportunity of gaining such discounts.

Essentially, complainant contends that the regulations were invalid because the Administrator did not grant a markup to lumber wholesalers, or, in other words a higher ceiling price than was granted to producing mills. As an alternative to a wholesalers' markup provision in the regulations, complainant urges that the alleged arbitrary and capricious character of the regulations might have been removed by having required therein the mills to grant their customary discounts and commissions to lumber wholesalers and commission men.

To support its contentions that the regulations compelled wholesalers and commission men to operate at greatly curtailed earnings and usually at a loss, or to discontinue business altogether, complainant introduced proof by way of affidavits of 16 wholesalers and 6 commission salesmen. These affidavits were forms prepared for filling in and signature. The form affidavit which was furnished the wholesalers contained the following statement: "The average annual net profit in affiant's business before federal income and excess profits taxes during the years 1942 to 1945,

both inclusive, and each of the years 1943 to 1944, was materially less than the average annual net profit in affiant's business before federal income and excess profits taxes during the years 1936 to 1941, both inclusive. As of his personal knowledge, affiant states that earnings experience in his business * * * has been duplicated by the similar experiences of many other direct mill shipping wholesalers and commission men."

One of the affiants modified the form language so as to report a *unit* margin reduction. Three affiants struck from the affidavit any statement as to the comparative pre-war and wartime profits in their own businesses. Outside of these general conclusions that the earnings of the persons in question were materially less, or that they operated at a loss or were forced to discontinue business, no proof was offered as to the amount of decline of profits or whether the net profits of wholesalers were diminished.

With regard to this proof, the Price Administrator pointed out, at the time he officially noticed certain evidence, the lack of data supporting the general allegations made in the affidavits filed by complainant and authorized an extension of sixty days in which complainant might file such supporting data. Complainant did not take advantage of this opportunity. His counsel stated that they had given careful consideration to the matter, and had concluded that such supporting evidence would be irrelevant, immaterial, and unnecessary to the determination of the issues, and that they did not want to encumber and obfuscate the record with such proof. They stated, however, that they would keep certain materials requested available for examination in their office by this court at reasonable times.

▐ There is no showing of the extent to which the affiants represented the situation of the entire number of wholesalers engaged in business during the period in question. There appear to be approximately 1,400 lumber wholesalers and commission men engaged in business in the United States. Complainant, in assembling his evidence, on one occasion sent out 500 circular letters to wholesalers requesting their

help in furnishing the necessary information and that he received 48 replies; that on another occasion, he sent out 500 more circular letters to assist in assembling his evidence and received 30 replies. It is to be observed that in determining whether regulations are generally fair and equitable, the effect of the regulations on the industry as a whole must be considered; and, furthermore, under price control, normal peacetime profits are not guaranteed to any seller individually. Interwoven Stocking Co. v. Bowles, Em.App.1944, 141 F.2d 696; Philadelphia Coke Co. v. Bowles, Em.App. 1943, 139 F.2d 349.

One of the affidavits submitted on behalf of complainant was that of the Executive Secretary of the National American Wholesale Lumber Association, which represents 372 wholesalers in 38 states. While such affiant stated that the effect of the regulations had been to destroy the normal peacetime earnings of direct mill shipping wholesalers and commission men, "to compel them either to abandon their operations or to operate at greatly curtailed earnings, and in some cases at a loss," it appears that he made this affidavit in November, 1946. On the other hand, in 1943, the same party had appeared before the House of Representatives' Small Business Committee and testified that in November, 1943, there was no threat, in the regulations, to the position or security of wholesalers, by stating that there was nothing in the situation in particular at that time "that would tend to eliminate the wholesaler." [10]

Not only did the Executive Secretary of the National American Wholesale Lumber Association feel that there was no disadvantage to the wholesalers, as far as markups were concerned, in the regulations in question in 1943, but he most strenuously opposed any provision for a wholesalers' markup at that time, stating that it was manifest that such a plan would disrupt existing practices and only add greater confusion to an already confused situation.

He declared that "this markup or overage plan will put the wholesaler immediately at a disadvantage in the fact that he is obliged to sell at a price higher than the ceiling, also at a price higher than anybody else sells, thus subjecting his sales to the natural resistance which is set in motion against payment of an additional price. The result of this must inevitably be that a purchase from the wholesaler will be made only when the buyer cannot get his requirements elsewhere at a lower price and the wholesaler's customers, being on notice that they are paying an additional amount, will be constantly seeking a cheaper source of supply, particularly when they know that the mill is selling at a lower price * * *." [11]

In addition, Herbert L. North, Secretary Manager of the National Association of Commission Lumber Salesmen, testifying on their behalf in 1943 before the Congressional Committee, opposed any markup for wholesalers on the ground that it was contradictory, disrupting, and confusing to industry customs of years' standing which have always included the selling costs within the market price, and that it would tend "to penalize, eliminate, and divert the efforts of the presently engaged, established, trained, and informed distribution personnel, instead of using to advantage their services for the war effort." [12] North also stated before the Congressional Committee, that in 1943, there was no shift, to his knowledge, in the procurement of lumber from the commission lumber salesmen. A number of other lumber wholesalers, in their testimony before the Congressional Committee in question, substantiated the fact that the wholesalers were not being bypassed by the mills, because of the regulations; but that their services were more valuable, at that very time, to the mills and were constantly utilized by the mills. In addition, a cost survey by the National American Wholesale Lumber Association, which was filed in this

---

[10] Hearings before the Select Committee to Conduct a Study and Investigation of the National Defense Program in Relation to Small Business in the United States House of Representatives, 78th Cong. 1st Sess. (1943) on H. Res. 18, Part 30, Page 2179.

[11] House of Representatives Hearings, supra, Note 10, Part 30, Pages 2186–2187.

[12] Ibid., Part 22, Pages 1607–1608.

case by complainant, indicated that in 1943 and 1944, the years involved in the present proceeding, wholesalers handled approximately the same volume of lumber as they had in the representative pre-war years, 1936 through 1939; and there was no indication that this survey, which was submitted as evidence in this case by complainant, was not generally representative of lumber wholesalers during the period in question. It is not to be wondered at that complainant, in his brief, takes the opportunity to state that he "is obviously free in this proceeding to assert the invalidity of the regulation, regardless of anything which may have been said or done in the past by representatives of the various associations of wholesalers and commission men." While, of course, the freedom of such assertion is not to be denied, the foregoing statements weigh heavily against complainant. It can hardly be maintained that where outstanding leaders and representatives of an industry, appearing before committees of Congress having this very question in hand, took the stand that markups would be disrupting, disadvantageous, and penalizing to wholesalers and commission men, the Administrator should be held guilty of arbitrary, capricious, and unlawful conduct in following and abiding by such judgment and guidance. Nor does it derogate from the force of such previously expressed and prevalent opinion in the industry that, subsequently, representatives of the various associations changed their attitude in certain particulars, and that later, certain of those appearing before the Congressional committees made contradictory statements in affidavit filed after the commencement of this proceeding.

The underlying basis of complainant's contention is that the wholesalers and commission men were bypassed by the mills during the period in question. This was not proved by complainant. In spite of the dire expectation that this would be the result—an anxiety which was entertained by many, including Price Administration officials, *the evidence before us* is to the contrary—it did not work out that way in practice. There was ample proof in this case that wholesalers and commission salesmen generally continued to operate in their usual manner throughout the war. Moreover, at the Congressional Hearings in 1943, it appeared that no one—except possibly Southern Pine dealers, not here in question—wanted markups for wholesalers and commission men. The heads of the great organizations representing wholesalers and commission men strongly opposed and fought the principle of markups, such as is here now contended for. In the light of the foregoing, the proof by affidavits on behalf of complainant, considering especially the lack of financial data to support the general allegations made, is not persuasive. It is also a rather significant fact that it was not until the fall of 1945 that the wholesalers made their first representation to the Office of Price Administration that they actually wanted a markup over mill ceiling prices.

In view of the arguments now made by the complainant, and the anxieties previously entertained by many interested in the problem of price control of lumber, it is of passing interest to refer to some of the reasons why, in many instances, wholesalers were able to function in an important way, even in a scarcity market during the war, instead of being completely, or generally, bypassed by the mills in their sales to the public. From evidence before a Senate Committee in 1945,[13] it appeared in the testimony of one of the leading wholesalers that the mills could not themselves distribute their lumber in carload lots throughout the war, as cheaply as they could, by utilizing the services of wholesalers; that the mills largely abandoned the idea of direct selling because of the fact that they would have otherwise had to set up a sales organization of their own; that, during the war, the mills began to be shorthanded and could not make lumber in all the required processes; that both large and small mills had difficulty in locating the buyers for the particular kinds of lumber they manufactured; and that it was largely through the services of the wholesalers in finding

[13] Hearings before the Special Committee to Study and Survey Problems of Small Business Enterprises, U. S. Senate, 79th Cong. 1st Sess. (1945), pursuant to S. Res. 28, Part 80, Pages 9158, 9164.

"priority users" and other buyers that many of the small, as well as large, mills were enabled to remain open and in continuous operation.

On the record before us, complainant has failed to sustain the burden of showing that the Administrator acted arbitrarily and capriciously in failing, in the regulations, to permit wholesalers and commission men to charge markups over mill ceiling prices in direct mill sales.

Of other proofs and arguments advanced to sustain complainant's claim, which we feel it is unnecessary to rehearse, it may be remarked that in spite of conflict in the evidence, complainant has clearly failed to sustain the burden of proving his contentions.

As has been said, complainant, in an alternative sense urges that the arbitrary and capricious failure on the part of the Administrator to permit a markup could have been remedied by a provision in the regulations requiring mandatory discounts to be granted to wholesalers and commission men, by the mills. The proposition thus advanced is whether the Administrator acted in an arbitrary or capricious manner in not providing for such mandatory discounts from the mills to wholesalers and commission men. In an affidavit submitted by complainant in this proceeding, he set forth:

"More than three hundred of the mills from whom affiant obtained lumber prior to price control have consistently refused to sell lumber to or through affiant since price control because of the necessity of allowing affiant a discount or paying affiant a commission in connection with such sales."

It was the Administrator's judgment, as pointed out in the statement filed by him in this case, "that if mills were required to grant the historically established 8% and 5% discounts and commissions in sales to wholesalers or through commission salesmen many of them might find it more economical, under wartime conditions, to establish their own selling departments even though they previously had not maintained any. In that way mills would actively be encouraged to bypass wholesalers. However, it was felt that if the mills were free to bargain with wholesalers for a discount smaller than 8% they would not have the same incentive to bypass wholesalers; that is, they could be expected to continue to allow discounts or commissions at least equal to the amount of expenditure which would necessarily be involved in maintaining their own sales facilities."

It is difficult to see how mandatory discounts could have helped the wholesalers. If the mills would prefer to sell directly to the public, instead of through wholesalers—when they were free to give wholesalers a small discount, it certainly does not seem that the mills would choose to sell through wholesalers if they would be obliged to grant them a much larger discount provided for by regulation. In any event, the Administrator, in not providing for such mandatory discounts—which do not seem to have even been sought by wholesalers—cannot be said to have acted in an arbitrary and capricious manner.

It is said that the regulations unlawfully discriminated in favor of the mills by making an allowance, in the mills' ceiling prices for discounts and commissions, but allowing the mills to sell at full ceiling prices, even where they did not avail themselves of a middleman and where no discount or commission was given. However, the historical pattern was that the mills, in their direct sales to the public, sold at the same price as did wholesalers and commission men. The essence of the alleged unequal treatment of the mills is that the mills were given a ceiling price which has customarily included a wholesaler's discount. The mills, however, according to complainant, did not use his services and, thus, award discounts. Therefore, he alleges that the mills derived a greater return from sales of lumber through the retention of the wholesaler's discount. The fallacy of this argument is that the mills did not even award a discount in peacetime in cases where they maintained their own sales agency or where they had sold directly to retailers or consumers. The use of an alternative, though, in fact, less general manner of marketing, cannot be said to be discrimination when market conditions rather

than price controls were the cause of the shift to this other means of distributing lumber.

■■ With regard to claimed discrimination in favor of the distribution yards, these always occupied an entirely different position in the industry, as compared to wholesalers. A distributing yard is a wholesale lumber yard which secures its lumber from mills or other yards. It ships, unloads, sorts, and resells or redistributes lumber. It further regularly maintains a varied stock of lumber products and is equipped to make quick deliveries of many different items in a large lumber-consuming area. While wholesalers and distribution yards both take title to the lumber, a wholesaler, like a commission man, does not have a yard and does not physically handle the lumber. Distribution yards always have sold lumber at higher prices than wholesalers, the prices varying as to whether the sales were at retail or wholesale, and there seems to be no question that they would properly be entitled to sell at higher prices. Wholesalers do not come within the same classification as distributing yards; and in the light of the historical relationships between wholesale distribution yards on the one hand and wholesalers and commission salesmen on the other, there appears on the part of the Administrator no unlawful discrimination against wholesalers in permitting such distribution yards a markup or higher selling price. The Administrator may make a classification, which if reasonable, will be upheld. Publicker Industries, Inc. v. Fleming, Em.App.1947, 162 F.2d 742. The classification and difference in treatment between the wholesalers and the wholesale yards is based on a difference in function and, therefore, reasonable and not discriminatory.

■ To the claim that wholesalers or commission salesmen of Southern Pine lumber were, by the allowance of a markup, unlawfully favored over those selling other species of lumber, it appears that the production and marketing of Southern Pine presented a special problem in the course of the war effort. This type of lumber was desperately needed at the time and it was the opinion of the Government officials charged with procurement of material necessary for the prosecution of the war that the granting of markups to wholesalers on sales of Southern Pine would be of assistance in the production and marketing of this type of lumber, and such a discretionary price increase in connection with such sales was accordingly granted. The granting of markups to wholesalers of Southern Pine lumber was justified on the ground that such lumber would not have been marketed in quantities sufficient to aid the war effort, except for the markups granted. Here, again, was a classification, based upon the type of lumber needed in wartime. In view of the foregoing, there appears clearly to have been a reasonable basis for the difference in treatment accorded the various species of lumber. The markup provision in connection with Southern Pine was a discretionary price increase beyond the minimum required by law. Complainant cannot establish that sellers of other species of lumber have been hurt merely by showing that Southern Pine dealers have been more favorably treated; he must adduce independent evidence that his group has been affected unfairly and inequitably, Madison Park Corporation et al. v. Bowles, Em.App. 1943, 140 F.2d 316, and that there was no reasonable basis for the difference in treatment accorded the various species of lumber, Northwood Apartments, Inc. v. Brown, Em.App. 1943, 137 F.2d 809.

■ The final ground upon which complainant bases his claim that the regulations were invalid is that they violated Section 2(h) of the Emergency Price Control Act, which forbids the Administrator to use his powers to compel changes in business practices or methods, or means or aids to distribution established in any industry.

Complainant contends that because of the regulation, lumber was not being distributed through wholesalers or commission salesmen during the period in question in this case. But, as we have already observed, complainant has failed to prove these allegations. As a matter of fact, the prohibition against markups, for which complainant contends, prevented a change in the historical industry practice. The evidence

in this case is to the effect that the regulation adopted the pricing structure historically employed in the lumber industry, and, as has been pointed out, the representatives of the industry were strongly opposed to any change in this pricing structure, which is now sought by complainant. The above mentioned opposition was founded on the theory that such changes would destroy the normal industry pattern and completely alter the traditional price relationships. It is conceded by complainant that in a period of short supply of lumber and an increased demand by the public, the payment of commissions on the sales of lumber would ordinarily have shifted from the mills to the retailers, so that the cessation of payment of commissions by mills during a sellers' market would be only a normal change in marketing conditions. It is our view that the regulations under attack, in providing the same ceiling prices in all direct mill sales, regardless of who the seller was, while imposing no obstacle to the process of free bargaining between mills and wholesalers within the ceiling so established, preserved the industry pattern, and in no sense, can be said to have compelled, or operated to compel, changes in established business practices. In view of the foregoing, it follows that the complainant has not sustained the burden of proving that the regulations in question were invalid.

A judgment will, accordingly, be entered dismissing the complaint.